IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned June 8, 2012 Session

# IN RE: MARIAH K. D.

**Appeal from the Chancery Court for Lincoln County**
**No. A298      James B. Cox, Chancellor**

---

**No. M2011-02655-COA-R3-PT - Filed July 30, 2012**

---

The great aunt and the great-grandmother of a little girl obtained an emergency order giving them temporary custody of the child when she was less than eight months old. The child's mother was informed that she was entitled to appear at a preliminary hearing and an adjudicative hearing on a more permanent custody order, but she failed to appear for those hearings. The trial court found that the child was dependent and neglected, and awarded custody of the child to her two older relatives. They subsequently filed a petition to terminate the parental rights of the mother on the grounds of abandonment and of persistence of conditions. The trial court found that both grounds were proved and granted the petition. We affirm the termination on the ground of persistence of conditions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT and ANDY D. BENNETT, JJ., joined.

Jonathan Caulley Brown, Huntsville, Alabama, for the appellant, J. M. D.

Melissa Thomas, Fayetteville, Tennessee, for the appellee, M.J.D., and R.D.

## OPINION

### I. CUSTODY PROCEEDINGS IN JUVENILE COURT

The child at the center of this case, Mariah K.D. was born in Huntsville Alabama on April 22, 2009 to Jennifer D. ("Mother"). No father was listed on the child's birth certificate. On December 4, 2009, two of Jennifer D.'s relatives, her aunt Margie D. ("Aunt"), and her paternal grandmother Ramona D. ("Grandmother"), filed a petition for emergency temporary

custody in the Juvenile Court of Lincoln County, Tennessee.[1]  They stated that when Mariah K.D. was five months old, Mother executed an agreement to give them custody of the child for a full year, but that a few weeks later, Mother came by and picked the child up because she did not want to abide by the agreement.

Aunt and Grandmother stated that, nonetheless, they still take care of the child a majority of the time and that they take her to all her doctor appointments.  They further claimed that Mother did not properly care for the child, that she was incapable of maintaining a stable home, and that she used illegal drugs or unauthorized prescription drugs to excess. They accordingly asked the court to adjudicate the child as dependent and neglected and to grant them custody of the child.

The trial court granted the requested temporary order of custody, and scheduled a preliminary hearing on a permanent order for December 9, 2009.  Because Mother had not yet been served by that date, the juvenile court continued the hearing until January 13, 2010, with the proviso that if Mother was served prior to that date, she could request a preliminary hearing within 72 hours of service.  The court also appointed a guardian ad litem for the child.

Mother was served, and she asked to be heard on December 23, 2009.  Mother did not appear for the hearing she asked for, however, and the court concluded that she had waived preliminary hearing.  But the court did make another attempt to hold a preliminary hearing on January 13, 2010.  Mother appeared, and represented to the court that she would retain counsel and return to court the following week.  She also gave the name and address of the alleged biological father of the child, Troy S.  He was served, but neither he nor Mother appeared on the newly scheduled hearing date.

An adjudicatory hearing was scheduled for March 17, 2010. Mother was served once again, but she did not appear for that hearing.  The court found that the child was dependent and neglected and that Mother had not demonstrated that she was competent to parent the child. The court subsequently entered an order awarding Aunt and Grandmother legal custody of the child, with full authority to provide "any necessary medical, surgical, hospital, psychological or educational needs of the child."

---

[1]Mother has tried to make an issue of the fact that Aunt and Grandmother are much older than the typical parents of a toddler and suggests that they may be incapable of fulfilling that role.  It is true that Aunt is actually Mariah's great-aunt and Grandmother is the child's great-grandmother, but the question of their capability was addressed through their own testimony and that of a number of witnesses who have known them for a long time, and who see them (and the child) at church on a regular basis.

## II. TERMINATION PROCEEDINGS IN CHANCERY COURT

On August 10, 2010, Aunt and Grandmother (hereinafter "Petitioners") filed a Petition in the Chancery Court of Lincoln County for Termination of the parental rights of Mother, Troy S., and "Unknown Father of Mariah K.D.," and for adoption of the child.[2] Two statutory grounds for termination were set out in the petition: Mother's abandonment by willfully failing to visit, support or make reasonable payments towards the child's support in the four months immediately preceding the filing of the petition; and the persistence of the conditions that led to the child's removal and which would prevent her safe return to Mother's care. Tenn. Code Ann. § 36-1-102(1)(A)(i) and Tenn. Code Ann. § 36-1-113(g)(3). Similar grounds were asserted against Troy S.

Mother filed an affidavit of indigency, and counsel was appointed to represent her in the termination proceedings. *See* 13(c) Rules of the Supreme Court ( requiring appointment of counsel for indigent defendants who have a statutory or constitutional right to representation); *Lassiter v. Dept. of Social Services,* 452 U.S. 18 (1981); *State v. David H.*, 247 S.W.3d 651, 655 (Tenn. Ct. App. 2006). The attorney filed an answer, which among other things, alleged that Petitioners "have tried to prevent the Mother's visitation and communication with her child and to damage the bond between Mother and child."

The court conducted a hearing on October 12, 2010, after which it filed a detailed order terminating the parental rights of Troy S., and Unknown Father of Mariah K.D., on the grounds of abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(i) and (iii).[3] The child was placed in the partial guardianship of Aunt, who was found to be a fit person to care for the child. The court also declared that "she shall have the right to adopt the child, pending the termination of the mother's parental rights."

Mother filed a motion for visitation on November 19, 2010, alleging that she had tried numerous times to visit the child, both before and after the filing of the petition to terminate her parental rights, but that Aunt and Grandmother repeatedly denied her visitation. The trial court denied Mother's motion and scheduled the hearing on the termination of her rights for March 3, 2011. However, on March 2, 2011, Janie F., Mother's mother, filed a petition to intervene in the custody action, alleging that it was not in the best interest of the child to

---

[2]The petition stated that Aunt would be the one to adopt the child, and that Grandmother joined the petition for the purpose of providing her consent to the adoption.

[3]A DNA test was subsequently performed, which excluded any possibility that Troy S. was the father of Mariah K.D. However, Troy S. was acknowledged to be the father of Mother's older daughter. The older daughter was in Mother's legal custody, but was in the physical custody of the mother of Troy S.

remain in the legal custody of Aunt and Grandmother. After a hearing, the trial court denied Janie F.'s petition on the ground of lack of standing.

### III. THE FINAL TERMINATION HEARING

The final hearing on the termination petition was conducted on August 30, 2011. Trial testimony was largely a family affair. Mother, Aunt and Grandmother all testified, as did Mother's father, his current wife, and his former wife (Mother's mother, Janie F.). Other testifying witnesses included friends and acquaintances of Petitioners, and a social worker who testified as an expert on bonding and family reunification.

Aunt testified that she and Grandmother filed their original petition for custody because they learned after a visit to the doctor that the child had multiple medical problems, and that they could not give a valid consent for treatment without an order signed by a judge. Among the child's conditions were hydrocephalus, for which a shunt had to be surgically implanted, severe asthma, and a congenital heart condition which will eventually have to be addressed.

Aunt and Grandmother testified that they live together with Mariah in a home that Grandmother owns free and clear. Aunt is 58 years old. She works as a custodian at a junior high school, and earns $1,000 a month. She also has savings from the sale of a cabin that she previously owned. Grandmother is 81. She receives a monthly check from her late husband's social security. When Aunt is at work, Grandmother babysits for Mariah.

Both women were questioned about their health and testified that they are in good condition and that they had no major physical problems. Three of their long-time friends from church testified that they had observed Aunt and Grandmother with Mariah and that they believed the two were fully capable of raising a child. One of the witnesses was asked specifically about Grandmother's physical capacity:

Q. And even though she's 81 she can still pick the baby up?

A. She probably can pick me up.

Aunt also testified that Mother's father, Mark D. (who was also Aunt's younger brother and Mariah's grandfather) had agreed to take care of the child if something happened to them and that they had so provided in their wills. When Mark D. took the stand, he confirmed that he was "ready, willing and able" to assume that role for his granddaughter.

-4-

The proof showed that Mother's mother and father divorced when she was eight or nine and that Mother subsequently became estranged from her father. He testified that Mother's teenage years were troubled, that she stole her mother's credit cards, was sent to a detention home, and that she behaved in a way that made him think she was using drugs. He also testified that he believed she was a compulsive liar. She gave birth to her first child when she was sixteen, and she dropped out of school in the eleventh grade.

After dropping out of school, Mother mostly lived with friends or relatives, often moving from one to another. She was unable to hold down any job for very long, and she experienced long periods of unemployment between jobs. At the time of trial, she was sharing a trailer with her brother that had been paid for by her father. She testified that although she was unemployed, she had worked as a housekeeper at a LaQuinta Inn for three months in the summer prior to trial and that she also worked at McAlister's Deli for a time, but lost that job when she failed to show up because her brother's car was repossessed and she did not have a way to get to work. Aside from the lack of reliable transportation, Mother was arrested a number of times, the last time on June 27, 2011, creating an additional obstacle to employment.

Aunt and Grandmother testified to efforts they made to help Mother overcome her difficulties. Aunt testified that Mariah was five months old when Mother asked her and Grandmother to take care of the child so Mother could get her life straightened out. The next time Mother came to see them, she told them that her electricity would be cut off if she didn't pay the bill. Aunt gave Mother a check for seventy-five dollars, with the name of the payee left blank. When the check came back from the bank, Aunt saw that it was made payable to a man whose name she was not familiar with, rather than to the utility company. A copy of the check was entered into the record. When she took the stand, Mother gave a confused and rambling account of a series of a transactions that led her to give the check to that individual.

Aunt and Grandmother also bought Mother a new car, a Kia, out of their meager savings, because they thought it would enable her to find a job beyond her immediate neighborhood. Unfortunately, the car did not last long. Mother testified that it was stolen by "a guy I was seeing."[4] The car was then wrecked, and State Farm insurance paid over five thousand dollars for the damages. Mother testified that she did not get the proceeds because there was a title pawn on it and "he stole half the money."

Aunt and Grandmother moved out of their "patio home" to a larger home in November of 2010 so there would be more room for Mariah. They acknowledged that they

---

[4]At another point in her testimony, Mother denied that the car had been stolen.

did not inform Mother of their new address. They had also changed their phone number in June of 2010. Aunt testified that they did not tell Mother the new number because she had been making what they called "harassing telephone calls."

Mother testified that she tried to call numerous times in the four months before the termination petition was filed. Aunt acknowledged that before they changed the phone number, Mother called a lot to check up on the child. Aunt complained, however, that Mother would often call to say she was coming over to see the child and then would not show up and that she wanted to end those unproductive communications because "I don't feel like we should rearrange our life to suit Jennifer's." For her part, Mother testified that when she called and asked to see the child, Aunt often told her that they already had other plans.

Aunt also testified that she didn't feel it was necessary for Mother to see the child. She stated that during her infrequent visits, Mother often spent the time waiting for a phone call or sending text messages, and that when Mother held the child, she didn't pay much attention to her. For her part, Mother entered a set of photos into the record of her visit in April of 2010 for Mariah's first birthday party. The pictures show her playing with Mariah and with her older daughter and the two children apparently playing happily together. Another photo entered into the record depicts Mother holding Mariah during her final visit, in August of 2010.

Mother was asked about her failure to appear at the earlier custody proceedings in this case. She initially testified that she didn't remember anything about that. But at a later point in her testimony, she stated that she missed a scheduled hearing because she had been beaten up and did not want to appear in court with a black eye. Mother was also asked how many times she had gone to jail "since this action was pending." She answered that she had been jailed four times, but stated that "three of them is on the same harassing communication." She denied that she was using drugs and testified that she was paying for drug screenings every month as a condition of probation. She acknowledged that her brother had drug issues, but she quickly added, "but he's going to rehab." She also testified that she had signed up for GED classes a month before the hearing and had gone to one class so far.

Petitioners called Sandra Spies, a licensed social worker, as an expert witness. Ms. Spies testified that she had been a case manager for DCS for three and a half years, and that she currently operates an outpatient program for substance abuse and family recovery. Ms. Spies interviewed Aunt and Grandmother and observed their interactions with Mariah. In both her testimony and a report she prepared that was entered into the record, she stated that Aunt and Grandmother interacted appropriately with the child and that the child appeared to be comfortable and confident in their presence.

-6-

Ms. Spies also testified that children with hydrocephalus experience developmental, intellectual and emotional delays and that they find it difficult to form strong attachments with caregivers and with other children. She explained that she was speaking partially from personal experience because her 36 year old son suffers from hydrocephalus. Her opinion was that stability and continuity are vital for such children and that Mariah's best interest would be served by staying with Aunt and Grandmother. In response to questioning, she acknowledged that she had never met Mother and knew nothing about her.

When Mother's mother took the stand, she testified that she did not believe that Aunt and Grandmother were physically capable of taking care of Mariah. She further testified that Mother was trying to get her G.E.D., that she had been diligently searching for a job, and that she was no longer spending time with the friends who had led her astray. She asserted that Mother loved Mariah and was a good mother to her older daughter, whom she saw frequently and took to dental and medical appointments. Under questioning, Mother's mother admitted to an incident that occurred the previous month when she was arrested for threatening Mother by waving a loaded handgun around. She explained that she was drunk and on prescription medication and that she was mad at her daughter "because she didn't listen to me, as usual."

At the conclusion of testimony and closing arguments, the court issued a ruling from the bench, which was documented in a final order, entered on November 1, 2011. The trial court found that two separate grounds for termination had been proved, both by clear and convincing evidence: abandonment, as defined in Tenn. Code Ann. § 36-1-102(1)(A)(i) and persistence of conditions, as set out in Tenn. Code Ann. § 35-1-113(g) (3). The court also found by clear and convincing evidence that it was in the best interest of Mariah K.D. that the parental rights of her mother be terminated. The trial court accordingly terminated all of Mother's parental rights and placed the child in the full guardianship of her great-aunt. This appeal followed.

#### IV. STANDARDS FOR DECISION AND REVIEW IN TERMINATION CASES

The termination of parental rights is one of the most serious decisions that courts are called upon to make. Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1). "Few consequences of judicial action are so grave as the severance of natural family ties." *M. L. B. v. S. L. J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982))

A parent has a fundamental right, under both the federal and state constitutions, to

the care, custody and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The state may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The party seeking termination need establish the existence of only one statutory ground to support a termination. *In re Angela E.*, 303 S.W.3d at 251; *In re Valentine*, 79 S.W.3d at 546.

Persons seeking to terminate another's parental rights must prove two things, both of which must be proved by clear and convincing evidence: (1) that a statutory ground for termination of parental rights has been established; and (2) that termination of the parent's rights is in the best interests of the child. Tennessee Code Annotated § 36–1–113(c); *In re Angela E.*, 308 S.W.3d at 250 ; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *Santosky*, 455 U.S. at 769, and its purpose is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Bernard T.*, 319 S.W.3d at 586, 596 (Tenn. 2010); *In re Angela E.*, 303 S.W.3d at 250; *In re M.W.A.*, 980 S.W.2d at 622.

Our review on appeal of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton,* 676 S.W.2d 554, 555 (Tenn. 1984). Where the trial court does not make findings of fact, there is no presumption of correctness and this court "must conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Byrd v. Byrd*, 184 S.W.3d 686, 691 (Tenn. Ct. App. 2005)(quoting *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999)).

We review a trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp.*

*v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993). The Tennessee Supreme Court recently explained how the two standards interact on appeal of a trial court's decision in a termination of parental rights case. The court held that while a presumption of correctness applies to the trial court's findings of fact, whether the facts of a case sufficiently support a ground for termination is a conclusion of law, and thus it is reviewed with no presumption of correctness. *In the Matter of M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citing *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)).

## V. ABANDONMENT

One of the grounds for termination alleged by Petitioners was that Mother had abandoned her child. Abandonment has very specific statutory definitions. The relevant definition for the purposes of this case is:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

Tennessee Code Annotated 36-1-102(1)(A)(i).

The trial court held that Mother had abandoned Mariah K.D. by both failing to visit her and failing to support her during the relevant period. We will examine each of these determinations in turn.

### A. Failure to Visit

It its ruling from the bench, the trial court acknowledged that the proof showed that Mother had visited Mariah between three and five times during the relevant four month time period. The record includes photographs of Mother and Mariah together, taken during Mariah's first birthday party in April 2010, and another photograph of them taken in August 2010.

The court noted, however, that those visits never lasted more than an hour and a half, and it concluded that they amounted to merely "token visitation." Tennessee Code Annotated § 36-1-102(1)(E) states that "[f]or purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." "Token visitation" is defined in Tenn. Code Ann.

§ 36-1-102(1)(C) as follows:

> For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child.

Because of the constitutional dimensions of proceedings to terminate parental rights, a parent's failure to visit her child or to engage in more than token visitation during the statutory period is not a sufficient ground for termination unless that failure is "willful." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re Adoption of Copeland,* 43 S.W.3d 483, 488 (Tenn. Ct. App. 2000); *Menard v. Meeks*, 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000). Where a parent has been thwarted in visitation efforts, our courts have declined to find willful abandonment. *In re F.R.R., III*, 193 S.W.3d at 530; *In re D.A.H.*, 142 S.W.3d 267, 277 (Tenn. 2004); *Menard v. Meeks*, 29 S.W.3d at 874.

The record in this case shows that Aunt and Grandmother were extremely supportive of Mother at first, but that over time they became upset by her unreliability. In June of 2010, they changed their phone number and they did not inform Mother of the new number because they did not want to be bothered by her phone calls, and they did not feel it was necessary for her to see the child. Thus, Mother became unable to contact Petitioners to arrange visitation.

The proof also showed that Mother did not have her own transportation after she lost the car that Aunt and Grandmother had given her, and that she had to rely on friends to go anywhere that was not within walking distance of wherever she was living.[5] Despite those difficulties, Mother did manage to visit the child several times in the four months prior to the filing of the termination petition. We therefore cannot agree with the trial court's conclusion that Petitioners met their burden of proving by clear and convincing evidence that Mother abandoned Mariah by willfully failing to engage in more than token visitation.

## B. Failure to Support

The trial court also found that Mother abandoned her child by willfully failing to make

---

[5]The proof showed that Mariah K.D. was born in a hospital in Huntsville, Alabama, that Aunt and Grandmother resided in Lincoln County, Tennessee, and that Mother lived in Madison County, Alabama during the course of many of the proceedings in this case. There is not sufficient evidence in the record to determine where Mother was living in the four months prior to the filing of the termination petition.

reasonable payments towards her support in the four months prior to the filing of the termination petition. The court correctly stated that a parent's obligation to support his or her child does not depend on the existence of a child support order. *In re J.J.C.,* 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004)(citing *State Dept. of Human Services v. Manier,* No. 01A01–9703–JV–00116, 1997 WL 675209, at *5 (Tenn. Ct. App. Oct. 31, 1997)).

As in allegations of abandonment arising from failure to visit, a parent cannot be found to have abandoned a child by failing to support that child unless the failure was willful. *In re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004); *In re Adoption of Copeland,* 43 S.W.3d at 488; *Menard v. Meeks*, 29 S.W.3d at 874. Failure to support a child is "willful" when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support. *In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995); *Pierce v. Bechtold,* 448 S.W.2d 425, 429 (Tenn. Ct. App. 1969).

Mother testified that she tried to give Petitioners money, diapers, baby wipes and other necessities for the child, but that they turned down her offers. She also stated that she bought gifts for the child's birthday. Aunt testified that Mother sent Mariah an Easter card with a $20 bill in it. The trial court acknowledged that Mother's financial resources were limited, but noted that "there has been times when the mother has had resources available to her. I believe the summer of 2010 was one of those times based on her testimony." Of course, that was the same summer during which the termination petition was filed.

The court was referring to Mother's testimony that she worked as a housekeeper at a LaQuinta Inn for three months in the summer of 2010. She testified that she earned between $7.25 and $7.75 per hour, but that her hours were cut back. There was no testimony in the record as to how many hours Mother actually worked and how much her minimal basic living expenses amounted to. It is undisputed that Petitioners never requested any form of support from Mother. While it might be possible to conclude from the evidence that Mother had the capacity to provide support for her child during her brief period of employment, we do not believe that the proof rises to the clear and convincing standard required for the establishment of the statutory ground of abandonment by reason of willful failure to support.

## VI. PERSISTENCE OF CONDITIONS

The trial court found that the another ground for termination was proved by clear and convincing evidence, one that is often referred to as "persistence of conditions." It is set out in Tenn. Code Ann. § 36-1-113(g)(3) as follows:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

The trial court took judicial notice of the fact that Mariah was removed from Mother's home by the Juvenile Court's temporary order of custody in December of 2009, and that she was away from Mother's home for far more than six months. Prior to that order, Mother asked Petitioners to take care of the child, because she herself was unable to do so, and she hoped that by being relieved of that responsibility, she would be able to get her life together. Our task is therefore to examine the evidence as to her efforts, and her success, in remedying the conditions that made her unable to care for the child. Unfortunately, Mother's own testimony is often confusing and contradictory, and the trial court explicitly found that she lacked credibility.

In any case, the proof showed that when Mother turned Mariah over to Petitioners, she was woefully lacking in the means necessary to establish a safe and permanent home for a young child. There was no proof that she suffered from any kind of physical disability, but she did not have a stable residence and she had not succeeded in obtaining any kind of gainful employment. Among the obstacles standing in her way were the lack of a High School diploma or a G.E.D. and the lack of reliable transportation.

Petitioners tried to help Mother by giving her a new car. Although Mother's testimony about the exact circumstances that led to the loss of the car was murky, it is undisputed that she did not have the use of it for very long. Petitioners' attorney asked Mother what changes there had been in her circumstances since she was last in court. Mother responded, "I'm in school, I'm trying to better myself, I have been looking for a job." She then recited the names of eight hotels and fast food restaurants where she testified she had gone to in the previous week in search of a job, without success.

The attorney then questioned Mother about the progress she had made towards obtaining her G.E.D. He reminded her that she had previously stated to the court that she

would be taking her G.E.D. test on June 16. She testified that she did not follow through because she was not prepared for the test and did not see the point of wasting money by paying to take it. She then stated that she was taking classes three times a week, but admitted that so far she had gone to only one class, on the day before the hearing.

Mother insisted that her housing situation was now stable, because she was living in a trailer with her brother, and that he was supporting her. But in its statement from the bench, the trial court pointed out that "there's no guarantee of a roof if your brother gets mad at you." Unfortunately, Mother's brother did not appear to testify at trial. Mother stated that he could not come because he had to work and could not afford to take any more time off.

Although Mother assured the court that her intentions were good, the overwhelming evidence showed that she failed to make any meaningful progress towards correcting the conditions that led to the removal of Mariah from her care. She did not manage to hold any job for an extended period of time, and she remained unemployed for most of the time, including on the day of trial. The only step she has taken towards advancing her education was to attend a single G.E.D. review class. She does have a place to live, but she remains there solely at the sufferance of her brother, who can evict her any time he wants. Because she was arrested a number of times, most recently just a few weeks before the termination hearing, she did not even manage to avoid the sort of trouble that usually leads to increased insecurity and instability in any home.

Over two and a half years passed between the transfer of legal custody of the child from Mother to Aunt and Grandmother and the final hearing on their petition to terminate Mother's parental rights. Mother had lots of excuses, but she was unable to present any evidence that she had made real progress on any of the conditions that led to the removal of the child from her care or that such progress could be expected in the near future. Thus, there appears to be little likelihood that those conditions will be remedied any time soon.

Mariah is fortunate that Aunt and Grandmother have been available to take care of her needs, and to provide her with a stable home. Sarah Spies testified that because of the child's hydrocephalus, she probably needs stability and continuity even more than most children do. Consistent and responsible attention will also be needed to deal with the child's other medical problems. Aunt and Grandmother are prepared to adopt Mariah, thereby eliminating any uncertainty about their legal responsibilities to her. But an adoption cannot take place until Mother's parental rights are terminated. Thus, the continuation of Mother's relationship to Mariah greatly diminishes the child's chances of early integration into a safe, stable and

permanent home. We therefore agree with the trial court that all three elements of the ground of persistence of conditions have been proved by clear and convincing evidence.

## VII. THE BEST INTEREST OF THE CHILD

Once a ground for termination has been established, the court is then required to examine whether termination is in the best interest of the child. To assist the court in making that determination, the legislature has set out a list of factors to consider:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(g)(i)

We have already addressed some of those factors in dealing with the grounds for termination involved in this case, so we need not discuss them here in much detail. Not all of the above factors are applicable, but of those that are, none appear to support Mother's argument that it would not be in Mariah's best interest for her relationship to the child to be terminated.

Mother has not adjusted her circumstances, conduct, or conditions so as to make it in Mariah's best interest to be in her home. She has not exercised regular visitation with the child. She had not paid child support consistent with the child support guidelines. Given the child's age, Mother's lack of visitation, and the testimony of Petitioners' expert that children with hydrocephalus have difficulty forming personal attachments, it is highly unlikely that the relationship between Mother and Mariah is meaningful to the child. For the same reasons, a change of caretakers and physical environment is likely to have a detrimental effect on the child's emotional, psychological and medical condition. In short, it is in Mariah's best interest that Mother's parental rights be terminated, and we accordingly affirm the trial court.

## VIII.

The judgment of the trial court is affirmed. We remand this case to the Chancery Court of Lincoln County for any further proceedings necessary. Tax the costs on appeal to the appellant.

_____
PATRICIA J. COTTRELL, JUDGE